ANGUS NI (Admitted *Pro Hac Vice*)
E-mail: angus@afnlegal.com
AFN Law PLLC
506 2nd Ave, Suite 1400
Seattle, WA 98104
Telephone: (646) 543-7294

YAO WEN (NBN 14299)
E-mail: ywen@wendotlaw.com
Wendot Law Group
411 E. Bonneville Ave. #150
Las Vegas, NV 89101
Telephone: 702-520-8888

*Attorneys for Defendant China Green Agriculture Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| GLENN LITTLE<br><br>             Plaintiff,<br><br>   v.<br><br>CHINA GREEN AGRICULTURE, INC.;<br>ZHUOYU LI; LIANFU LIU; YONCHENG<br>YANG; and, JOHN DOES 1-10<br><br>           Defendants. | CASE NO.: 2:19-cv-01756-JCM-NJK<br><br>**DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**<br><br>**ORAL ARGUMENT REQUESTED** |

PLEASE TAKE NOTICE THAT, pursuant to Rules 12(b)(6) and 23.1 of the Federal Rule of Civil Procedure, Defendant China Green Agriculture, Inc. ("CGA" or the "Company"), respectfully moves the Court to dismiss Plaintiff Glenn Little's Complaint (the "Complaint" or "Compl.") (ECF No. 1). As detailed in this Motion, Plaintiff has not alleged sufficient factual matter to state a claim for relief that is plausible on its face. In addition, Plaintiff's allegations fail because they allege derivative claims directly, and furthermore, did not meet Federal Rule Of Civil Procedure 23.1's requirements for pleading a valid demand.

1    This Motion is based this Notice of Motion, the following Memorandum of Points and

2  Authorities, the accompanying Declaration of Angus Ni and exhibits thereto, the record in this

3  action, and such other matters and argument as may be presented to the Court.

4

5    Dated this 13th day of December, 2019.

6                                                     **AFN Law PLLC**

7                                                     By _____

8                                                     Angus F. Ni (admitted *pro hac vice*)
                                                     506 2nd Ave, Suite 1400

9                                                     Seattle, WA 98104
                                                     Telephone: 646-543-7294

10

11                                                    **Wendot Law Group**

12                                                    /s/ *Yao Wen*
                                                     _____

13                                                    Yao (Kelvin) Wen (NBN 14299)
                                                     E-mail: ywen@wendotlaw.com

14                                                    411 E. Bonneville Ave. #150
                                                     Las Vegas, NV 89101

15                                                    Telephone: 702-520-8888

16

17

18

19

20

21

22

23

24

25

26

27

1

**TABLE OF CONTENTS**

2   I. PRELIMINARY STATEMENT .................................................................................... 1

3   II. FACTS ...................................................................................................................... 1

4      A.  The Company's Stock Price And The Need For A Reverse Stock Split ...................... 1

   B.  The Reverse Stock Split ........................................................................................... 3

5      C.  The Company's 2019 Private Placements ................................................................. 4

6   III. LEGAL STANDARD .................................................................................................. 5

7   IV. ARGUMENT .............................................................................................................. 6

   A.  The Complaint Fails To State A Claim ..................................................................... 6

8         1.  The Complaint Alleges No Plausible Wrongdoing ........................................... 7

9         2.  The Complaint Articulates No Plausible Loss And Accordingly No
          Cognizable Theory of Damages ...................................................................... 11

10     B.  In Any Event, Plaintiff Failed To Properly Plead Derivative Claims ......................... 13

11        1.  Plaintiff's Claims Are Derivative, Not Direct ................................................. 13

12        2.  The Complaint's Allegations Fail Under Rule 23.1 ......................................... 14

V. CONCLUSION ............................................................................................................ 17

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Defendant's Motion to Dismiss - iii

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*In re Allied Nev. Gold Corp., Sec. Litig.,*
   2017 U.S. Dist. LEXIS 152905 (D. Nev. Sep. 20, 2017) ................................................... 2

*Allstate Ins. Co. v. Countrywide Fin. Corp.,*
   842 F. Supp. 2d 1216 (C.D. Cal. 2012) ................................................... 9

*In re AMERCO Deriv. Litig.,*
   127 Nev. 196 (2011) ................................................... 13, 15

*Ashcraft v. White Pine Cty. Hosp.*
   2012 U.S. Dist. LEXIS 38058 (D. Nev. Mar. 21, 2012) ................................................... 17

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................... 5

*Birdsong v. Apple, Inc.,*
   590 F.3d 955 (9th Cir. 2009) ................................................... 12

*Bleich v. Am. Network,*
   1992 U.S. App. LEXIS 6390 (9th Cir. Mar. 23, 1992) ................................................... 6

*Brady v. Anderson,*
   1998 U.S. Dist. LEXIS 20774 (C.D. Cal. May 27, 1998) ................................................... 11

*Compartment IT2, Ltd. P'ship v. Fir Tree, Inc.,*
   2018 U.S. Dist. LEXIS 54066 (D. Nev. Mar. 30, 2018) ................................................... 13, 14

*In re Comput. Scis. Corp. Derivative Litig.,*
   2007 U.S. Dist. LEXIS 25414 (C.D. Cal. Mar. 26, 2007) ................................................... 6

*Gardner v. Martino,*
   563 F.3d 981 (9th Cir. 2009) ................................................... 17

*In re Google, Inc. S'holder Derivative Litig.,*
   2012 U.S. Dist. LEXIS 64638 (N.D. Cal. May 8, 2012) ................................................... 6

*Kentmaster Manufacturing v. Jarvis Products Corp.,*
   146 F.3d 691 (9th Cir. 1998) ................................................... 17

*Litle v. Waters,*
   1992 Del. Ch. LEXIS 25 (Ch. Feb. 10, 1992) ................................................... 7, 10

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................... 6, 12

*In re Medvedeva,*
   2009 U.S. Dist. LEXIS 95809 (W.D. Wash. Sep. 30, 2009) ................................................12

*In re MGM Mirage Sec. Litig.,*
   2013 U.S. Dist. LEXIS 139356 (D. Nev. Sep. 26, 2013) ........................................................1

*Opdyke v. Sec. Sav. & Loan Co.,*
   157 Ohio St. 121 (1952) ................................................................................................11

*Parametric Sound Corp. v. Eighth Judicial Dist. Court of Nev.,*
   401 P.3d 1100 (Nev. 2017) ......................................................................................13, 14

*Peterson v. 21st Century Centennial Ins. Co.,*
   2015 Del. Super. LEXIS 335 (July 9, 2015) ................................................................12

*San Diego County Gun Rights Comm. v. Reno,*
   98 F.3d 1121 (9th Cir. 1996) ..........................................................................................6

*Sax v. World Wide Press, Inc.,*
   809 F.2d 610 (9th Cir. 1987) ........................................................................................13

*Scott v. Pasadena Unified Sch. Dist.,*
   306 F.3d 646 (9th Cir. 2002) ........................................................................................10

*Shoen v. SAC Holding Corp.,*
   137 P.3d 1171 (Nev. 2006) .....................................................................................13, 15

*Simmonds v. Credit Suisse Sec. (USA) LLC,*
   2011 U.S. App. LEXIS 974 (9th Cir. Jan. 18, 2011) .........................................14, 15, 16

*Sprewell v. Golden State Warriors,*
   266 F.3d 979 (9th Cir. 2001) ..........................................................................................5

*Telesaurus VPC, LLC v. Power,*
   623 F.3d 998 (9th Cir. 2010) ........................................................................................17

*United States v. Hester,*
   2015 U.S. Dist. LEXIS 173394 (S.D. Cal. Dec. 30, 2015) ..........................................11

*In re Walt Disney Co. Derivative Litig.,*
   906 A.2d 27 (Del. 2006) ...............................................................................................10

*Weinfeld v. Minor,*
   2016 U.S. Dist. LEXIS 30117 (D. Nev. Mar. 8, 2016)..........................................1, 15

*Whitson v. Bumbo,*
   2009 U.S. Dist. LEXIS 32282 (N.D. Cal. Apr. 15, 2009) ...........................................12

**Statutes**

Nev. Rev. Stat. Ann. § 78.257 ............................................................................16

Nev. Rev. Stat. Ann. § 78.257(6) .......................................................................16

**Other Authorities**

Securities Exchange Commission Release No. 34-85374 ...........................................12

Securities Exchange Act Release No. 84821 ...........................................................12

Federal Rule of Civil Procedure 12(b)(6) .............................................................1

Federal Rule of Civil Procedure 23.1 .....................................................1, 13, 14, 17

# I.  PRELIMINARY STATEMENT

Plaintiff's Complaint misstates publicly available facts, fails to follow well-settled pleading requirements for derivative claims, and generally fails to state a plausible claim under rule 12(b)(6) because it articulates neither wrongdoing nor injury.

*First*, the Complaint's allegations of wrongful equity dilution are premised on a series of mistakes Plaintiff made when reading the Company's disclosures, as well as Plaintiff's decision to ignore a 1 for 12 reverse stock split that occurred in the middle of 2019 which stockholders overwhelmingly approved. These errors caused Plaintiff to allege incorrect facts and figures.

*Second*, the Complaint fails to allege that there has been any wrongdoing by the Company and its board of directors, nor does it articulate any cognizable damages or even the existence of any injury in fact. Indeed, the complained-of transactions—a series of private placements that took place in 2019—were executed at prices well *above* prevailing market prices. Thus, far from harming shareholders, the private placements actually benefited the Company and its shareholders.

*Third*, even setting aside the Complaint's fatal substantive pleading failures, Federal Rule of Civil Procedure 23.1 requires claims that assert harms suffered by the corporation to be pled derivatively. Here, even if the Complaint's alleged "harms" made sense, they would have been suffered by the Company itself, making Plaintiff's claims derivative. Plaintiff consciously pled direct claims; as such, the Complaint should be dismissed.

*Finally*, even if pled derivatively, the Complaint failed to show that Plaintiff made any adequate demand on the Company's Board. It also did not plead demand futility.

# II.  FACTS

## A.    The Company's Stock Price And The Need For A Reverse Stock Split

CGA is an agricultural fertilizer producer. Its stock trades on the New York Stock Exchange ("NYSE"), where it has been listed since 2009. Ex. A, at 12/140.[1]

---

[1] "[A] court may take judicial notice of matters of public record." *Weinfeld v. Minor*, 2016 U.S. Dist. LEXIS 30117, at *7 (D. Nev. Mar. 8, 2016) (internal quotation omitted). Publicly available SEC filings and a company's historical stock price may be judicially noticed, and courts in this district have done so. *See e.g. In re MGM Mirage Sec. Litig.*, 2013 U.S. Dist. LEXIS 139356, at *14 (D. Nev. Sep. 26, 2013) (judicially

On September 28, 2018, the Company informed the Securities Exchange Commission ("SEC") that it would be "unable, without unreasonable effort or expense, to file its Annual Report on Form 10-K for the year ended June 30, 2018 … by the September 28, 2018 filing date … due to a delay experienced by [CGA] in completing its financial statements and other disclosures …" Ex. B, at 2/3.

On October 1, 2018, NYSE informed the Company that "the 30-trading-day average closing price of the Company's common stock had fallen below $1.00 per share," which is "the minimum average share price required for continued listing of the Company's common stock on the NYSE." Ex. C, at 2/3 (the "NYSE Notice"). The Company disclosed the NYSE Notice four days later on October 5, 2018 in a filing with the SEC. *Id.*

As disclosed in the filing, "[i]n order to return to compliance with th[e] continued listing standard, the ending and 30-trading-day average share price **of the Company's common stock must equal or exceed $1.00**." *Id.* (emphasis added). The NYSE gave the Company ten days from its receipt of the notice to respond with an intent to remedy the Company's non-compliance with NYSE's listing threshold. *Id.* On October 11, 2018, ten days after its receipt of the NYSE Notice, the Company informed NYSE of its intent to cure the non-compliance. Ex. D, at 2/3.

On October 16, 2018, NYSE notified the Company that it was in non-compliance with another NYSE listing requirement due to its delay in filing its Form 10-K annual report. Ex. E.

On October 19, 2018, three days after the second NYSE filing-delay notice and three weeks after notifying the SEC that its Form 10-K annual report would be filed late, the Company completed its financial statements and other disclosures and filed its annual report. Ex. F. In that report, the Company disclosed a net loss of approximately $6.9 million, which involved "a decrease [in net income] of $32,083,379, or 127.6%, compared to … the fiscal year ended June 30, 2017." *Id.* at 57/135. The sudden downward swing in profitability was caused by the U.S. Tax Cuts and Jobs Act ("TCJA"), enacted on December 22, 2017. *Id.* at 119/135. Because the Company

---

noticing SEC filings and listed company's stock prices); *In re Allied Nev. Gold Corp., Sec. Litig.*, 2017 U.S. Dist. LEXIS 152905, at *15 (D. Nev. Sep. 20, 2017) (same). All "Ex. __" references are to Exhibits attached to the accompanying Declaration of Angus Ni. All pagination are to the bottom right of the exhibits.

is based abroad but incorporated in the U.S., the TCJA required the Company "incur a one-time transition tax on deferred foreign income not previously subject to U.S. income tax at a rate of 15.5% for foreign cash and certain other net current assets, and 8% on the remaining income." *Id*. Accordingly, for fiscal year 2018, the Company recorded a one-time charge of $29 million directly attributable to the change in the U.S. tax-regime. *Id*.  In parallel with these above disclosures, the Company's share price continuously declined in the last several months of 2018. *See* Ex. G.[2]

**B.     The Reverse Stock Split**

On April 29, 2019, about seven months after the NYSE Notice, the Company released its Preliminary Proxy Statement for fiscal year 2019. Ex. H. (the "PPS"). The PPS set forth several proposals for shareholders to vote on at the Company's annual shareholder meeting, including "Proposal Four: Amendment To Articles Of Incorporation To Effect 1 For 12 Reverse Stock Split." *Id.* at 34/44.  As the PPS explained:

> On October 1, 2018, the NYSE notified us that the 30-trading-day average closing price of the Company's common stock had fallen below $1.00 per share, the minimum average share price required for continued listing of the Company's common stock on the NYSE. Under NYSE rules, the Company generally has six months (subject to possible extension) to regain compliance with this continued listing standard and avoid delisting. ***The Company … has concluded that the Reverse Stock Split is the most efficient way of increasing the price in order to comply with the NYSE's minimum share price rule.***

> *Id.* (emphasis added)

On May 10, 2019, the Company filed its Definitive Proxy Statement for fiscal year 2019 with the SEC. Ex. I (the "DPS"). The DPS set an annual meeting date of June 22, 2019, as well as a "Record Date" of May 2, 2019—the date on which one must be a "shareholders of record" in order to be entitled to vote. *Id*. at 5/45. Explaining the mechanics of the proposed 1 for 12 reverse stock split, the DPS stated in a section entitled "Effects of the reverse stock split", that the total number of outstanding common stock will be divided by twelve from the pre-split figure of "45,546,945" to a post-split figure of "3,795,579". *Id*. at 35/45.  Addressing the pre-reverse split

---

[2] *See also* https://www.marketbeat.com/stocks/NYSE/CGA/chart/

share price, the DPS noted that "[o]n the Record Date, the last sale price of the Company's common stock was ***$0.58 per share***." *Id*. at 34/45 (emphasis added).

The price of $0.58 per share was well below the NYSE's minimum share price rule, which requires that common stock traded on the NYSE must trade at a price of at least $1.

On June 22, 2019, the proposal to effect a 1 for 12 reverse stock split was submitted to a shareholders' vote. Ex. J. More than 82.46% of the Company's outstanding shares voted by proxy, and the reverse stock split was approved by more than 85% of those voting, representing holders of more than 70% of the Company's total outstanding common shares. *Id.*

On June 27, 2019, pursuant to the stockholders' vote, the Company effectuated the 1 for 12 reverse split as of market close. Ex. K (the "Reverse Split"). Per the DPS proposal, whereas the Company's shares closed on June 27, 2019 trading at $0.49 per share, they began trading the next day at $5.76 per share—twelve times the June 27 per share price. Two changes had occurred: (i) the total number of outstanding shares decreased by a factor of twelve; and (ii) the Company regained compliance with NYSE's $1 per share listing threshold and remained listed on the NYSE.

**C.     The Company's 2019 Private Placements**

In parallel with the Reverse Split process, the Company conducted a series of private placements throughout the middle of 2019 to raise capital by issuing common stock. ***Every single one of the private placements were executed at prices that were above prevailing market prices***.

The first of the private placements occurred on April 25, 2019, when the Company conducted a "private placement offering of 6,000,000 shares of common stock" at $1.00 per share. Ex. A, at 127/140. On that day, the Company's stock closed at $0.50 per share, the offering thus raised $6 million for the Company at a price that was ***double*** its market price. *See* Ex. G, at 2.[3]

On May 10, 2019, the Company conducted a second private placement by issuing "2,270,000 shares of common stock at the price of $1.00 per share for total proceeds of

---

[3] Stock prices quoted on publicly available websites like Marketbeat, Yahoo Finance, and Google Finance apply the post-Reverse Split prices retroactively to pre-Split prices. Thus, all currently quoted pre-June 27, 2019 prices on public stock price trackers must be divided by 12 to reflect their actual then-price.

$2,270,000." Ex. A, at 127/140. Because the Company's stock closed at $0.51 per share on that day, this offering again valued the Company at almost **double** its market price. *See* Ex. G, at 2.

On August 13, 2019, after the 1 for 12 reverse stock split, the Company conducted a third private placement by selling "212,000 shares of common stock at the price of $10.00 per share for total proceeds of $2,120,000." Ex. A, at 140/140. Because this third private placement was conducted **after** the 1 to 12 reverse stock split, the Company's public share price closed that day at $3.49 per share. *See* Ex. G, at 2. The private placement price of $10.00 per share therefore valued the Company at a price that was **2.8 times** market value. The Complaint ignored this placement.

On August 15, 2019, the Company sold "471,000 shares of Common Stock [in another private placement offering at a per share price of] $12.00 for total proceeds of $5,652,000." Ex. A at 140/140. On that day, the market price of the Company's shares closed at $3.35. *See* Ex. G, at 2. The offering valued the Company at a price that was **3.58 times** market value. The Complaint erroneously alleges that this offering occurred on August 16, 2019 at $1.00 per share. Compl. ¶11.

On August 19, 2019, "the Company sold 248,000 shares of common stock at the price of $10.00 per share for total proceeds of $2,480,000." Ex. A, at 140/140. On that day, the market price of the Company's shares closed at $4.21. *See* Ex. G, at 2. The offering valued the Company at a price that was **2.37 times** its market value. The Complaint ignored this placement.

In all, the private placements between April and August of 2019 (the "Private Placements") raised approximately $18.52 million for the Company. This represented approximately 25.6% of the Company's total cash position as of the end of fiscal year 2019. *See* Ex. A, at 96/140.

### III. <u>LEGAL STANDARD</u>

A court must dismiss a complaint on a motion to dismiss if its allegations fail to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the allegations of a complaint are generally accepted as true for purposes of a motion to dismiss, a court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

1       "Standing is an essential, core component of the case or controversy requirement." *San*

2  *Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (quotations and

3  citations omitted). The plaintiff has the burden of establishing standing, and the first element it

4  must show is that it has "suffered an 'injury in fact'—an invasion of a legally protected interest

5  which is (a) concrete and particularized, and (b) actual and imminent, not 'conjectural' or

6  'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

7       "Nevada courts look to Delaware law for guidance on issues of corporate law." *In re*

8  *Comput. Scis. Corp. Derivative Litig.*, 2007 U.S. Dist. LEXIS 25414, at *12 (C.D. Cal. Mar. 26,

9  2007) (citing *Shoen v. SAC Holding Corp.*, 137 P.3d 1171, 1179-80 (Nev. 2006)).

10  

**IV.  <u>ARGUMENT</u>**

11  **A.**    **The Complaint Fails To State A Claim**

12       Plaintiff alleges: (i) breach of fiduciary duty based on "corporate waste", and (ii) "Minority

13  Shareholder Oppression-Wrongful Deprivation of Shareholder Interests". Compl. at 5-6.

14       To allege corporate waste, Plaintiff must allege that a challenged transaction was "so one

15  sided that no business person of ordinary, sound judgment could conclude that the corporation has

16  received adequate consideration." *In re Google, Inc. S'holder Derivative Litig.*, 2012 U.S. Dist.

17  LEXIS 64638, at *36 (N.D. Cal. May 8, 2012) (citing *In re Walt Disney Co. Derivative Litig.*, 906

18  A.2d 27, 74 (Del. 2006) ("A claim of waste will arise only in the rare, unconscionable case where

19  directors irrationally squander or give away corporate assets. This onerous standard for waste is a

20  corollary of the proposition that where business judgment presumptions are applicable, the board's

21  decision will be upheld ***unless it cannot be attributed to any rational business purpose***.")

22  (emphasis added)).

23       As for the second claim of "minority shareholder oppression", it is unclear that such a cause

24  of action even exists for shareholders of public companies under Delaware law, as public market

25  shareholders can sell their shares at the first sign of disagreement with fellow shareholders rather

26  than be "oppressed" by an unnamed majority. *See Bleich v. Am. Network,* 1992 U.S. App. LEXIS

27  6390, at *5 (9th Cir. Mar. 23, 1992) (explaining that because "there is no public market for shares

of a close corporation," minorities in close corporations may assert claims of oppression directly rather than derivatively, whereas "[m]inority shareholders in a publicly traded corporation, by contrast, can sell their shares at any time.") This count should be dismissed on this ground alone.[4]

Assuming, *arguendo*, that the claim even exists, Delaware courts have described "oppression" in the close corporation context as "burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." *Litle v. Waters*, 1992 Del. Ch. LEXIS 25, at *22 (Ch. Feb. 10, 1992)

Both the breach of fiduciary duty through "corporate waste" and "minority shareholder oppression" claims are based on the same alleged wrongful "dilution" of Plaintiff's equity in the Company. Compl. ¶¶34, 39. But Plaintiff's dilution allegations are plainly contradicted by the Company's SEC filings. Indeed, the Company's allegedly "dilutive" actions over the course of 2019 actually *benefited* shareholders and *preserved* the value of Plaintiff's investment.

### 1.    The Complaint Alleges No Plausible Wrongdoing

Plaintiff based his Complaint on his own arbitrary and incorrect calculations to allege wrongful equity dilution stemming from the Private Placements. The mistaken calculations and the conclusions Plaintiff draws from them are plainly contradicted by the Company's SEC filings. Because the Private Placements were all executed at above-market prices, there was no wrongful equity dilution.

*First*, despite basing his entire claim on purportedly "dilutive" effect of the Private Placements, Plaintiff only identified the three that occurred on April 25, May 10, and August 16, 2019, and missed the two that occurred on August 13 and 19, 2019. *Cf.* Compl. ¶¶ 9-11 *with* Section II.C, *supra*. The Complaint also mistakenly alleges a date of August 16, 2019 for the

---

[4] The fact that public shareholders can simply sell their shares instead of remaining members of an unwilling "minority" sets the stage for the other main reason the Complaint should be dismissed—claims of harm to public corporations must be asserted derivatively. *See* Section B, *infra*.

August 15, 2019 private placement. *See* Compl. ¶11. The Complaint further mistakes that placement's offering price, which was $12.00 per share and not $1.00. *See* Compl. ¶11.

These errors caused Plaintiff to assume that the August 15, 2019 private placement, which raised $5,652,000, resulted in the issuance of 5,652,000 shares. *Id.* In reality, the Company only issued 5,652,000 / 12 = 471,000 shares for that offering. Ex. A at 140/140. Plaintiff also wrongly alleged a total amount raised through the Private Placements of $13.92 million (¶12) rather than the correct $18.52 million.

**Second**, Plaintiff ignored the Reverse Split, which caused him to dramatically over-estimate the number of shares outstanding and the effect of the Private Placements. The Complaint alleged that because of the Private Placements, "The number of CGA shares outstanding increased from 39,546,945 to 53,468,945." ¶13. But this latter figure, which Plaintiff came up with himself and is not reflected in the Company's disclosures, is wrong for a host of reasons.[5]

As set forth above, the first of the five Private Placements, which occurred on April 25, 2019, raised the total outstanding shares figure by six million, to 45,546,945 as of May 2, 2019. *See* Ex. I, at 7/45. The second offering, which occurred on May 10, 2019, also prior to the Reverse Split, added another 2,270,000 shares. The resulting total of 45,546,945 + 2,270,000 = 47,816,945 was then reduced twelve-fold by the Reverse Split for a post-June 27, 2019 total outstanding share count of approximately 3.98 million shares by June 28, 2019. *See* Ex. K, at 1/2.

After the Reverse Split, three more private placements occurred on August 13th, 15th, and 19th, 2019. These resulted in the issuance of 212,000, 471,000, and 248,000 shares, respectively. Ex. A, at 140/140. The Company's total outstanding shares as of the end of August, 2019 therefore increased to approximately 4.97 million shares. Ex. M, at 5/58. Because Plaintiff completely ignored the Reverse Split—which shareholders were repeatedly notified of and which they overwhelmingly voted to approve, he reached a post-Private Placements total share figure of 53.4 million shares—which was wrong by an order of magnitude.

---

[5] Plaintiff's starting, pre-Private Placements and pre-Reverse Split outstanding shares figure of 39,546,945 comes from the Company's March 31, 2019 Form 10-Q. *See* Compl. ¶8.

1      **Third**, the Complaint's allegations are based on the concept of "Book Value … per share",

2  which is not a concept found anywhere in the Company's disclosures, but rather an arbitrary, self-

3  calculated measure that Plaintiff came up with. *See e.g.* Compl. ¶15. Book Value is a colloquialism

4  for Total Stockholders' Equity, which is assets minus liabilities.[6] Plaintiff calculated his per share

5  book value figures by dividing what he thought was the Company's book value by his (incorrect)

6  total outstanding share count.[7]

7      As disclosed, Company's book value (listed as its "Total Stockholders' Equity" in its

8  disclosures) changed from $392,547,787 as of June 30, 2018 to $403,657,917 as of March 31,

9  2019. Ex. L, at 4/65. This is because book value changes quarter to quarter as the Company's

10  assets and liabilities change to reflect its operating environment.

11      For his calculations, Plaintiff took the March 31, 2019 figure of $403,657,917, added the

12  incorrect "$13,922,000 net increase" in assets which he attributed to the Private Placements to

13  produce the also incorrect figure of $417,579,917 as of August 15, 2019. ¶12.[8] Plaintiff then

14  divided the wrong $417,579,917 number by the (also wrong) total share figure of 53 million, to

15  arrive at a per share book value of $7.8. Compl. ¶¶13-15.

16      As disclosed in the Company's latest Form 10-Q quarterly report, the Company's book

17  value as of September 30, 2019 was $382,454,402. Ex. M, at 5/58. Dividing this figure by the

18  correct total outstanding shares figure produces a per share book value of approximately $76.8.

19  Plaintiff's book value per share figure is thus again wrong by an order of magnitude. Compl. ¶16.

20      **Finally**, even if Plaintiff had gotten every calculation right, there would still be no

21  wrongdoing alleged. As explained above, as of October 1, 2018, the Company was facing the

22

---

23  [6] *See Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1229 (C.D. Cal. 2012) ("book

24  value (assets less liabilities)"); *see also* https://www.investopedia.com/articles/investing/110613/market-value-versus-book-value.asp#book-value-formula, last accessed November 27, 2019.

25  [7] *See* Complaint ¶¶12-15 (alleging a post-Private Placements "book value" of $417,579,917 and dividing

26  that figure by the (incorrect) post-Private Placements share count of 53,468,945.

[8] Had Plaintiff waited one week for the October 15, 2019 Form 10-K annual report to be released, which

27  disclosed a book value as of June 30, 2019 of $396,555,686, he would have been at least able to get closer
to reality. Ex. A, at 139/140.

prospect of delisting from NYSE unless it remedied its non-compliance with NYSE's $1.00 per share listing threshold rule.  As the Company repeatedly warned investors in its annual reports:

> If our common stock were delisted and determined to be a "penny stock," a broker-dealer may find it more difficult to trade our common stock and an investor may find it more difficult to acquire or dispose of our common stock on the secondary market. ***Investors in penny stocks should be prepared for the possibility that they may lose their whole investment.***

Ex. F, at 42/135 (2018 10-K); Ex. A, at 43/140 (emphasis added).

In response to the NYSE Notice, the Company quickly proposed and obtained shareholders' approval for the Reverse Split at its next annual meeting. *See* Section II.B, *supra*. In parallel with effectuating the Reverse Split, management also successfully negotiated five separate private placements in which private investors bought the Company's shares at premiums of ***multiples*** of their public market prices. *See* Section II.C, *supra*. These private investors' willingness to value the Company at massive premiums to its market capitalization could only have had the effect of ***driving up*** the Company's shares—which benefited public investors like Plaintiff.

Conversely, had the Company not conducted the Reverse Split and Private Placements, public market investors faced the prospect of delisting from NYSE, which would have engendered "the possibility [of] los[ing] their whole investment." Ex. A, at 43/140.  Thus, far from being "dilutive" of Plaintiff's investment, these transactions helped preserve it. *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 657 (9th Cir. 2002) (affirming dismissal where "[Plaintiff] has provided no evidence tending even to show that a particular plaintiff will not be benefitted rather than harmed by the … challenged [acts].")

In sum, the Company's acts helped rather than harmed shareholders by increasing the Company's assets and maintaining the liquidity of Plaintiff's shares. As such, Plaintiff has not come close to pleading the "rare, unconscionable case where directors irrationally squander or give away corporate assets" required to plead corporate waste. *See In re Walt Disney Co.*, 906 A.2d, at 74.  Nor has Plaintiff pled the "burdensome, harsh and wrongful conduct", or anything akin to it, necessary for demonstrating "oppression." *Litle*, 1992 Del. Ch. LEXIS 25, at *22.

### 2. The Complaint Articulates No Plausible Loss And Accordingly No Cognizable Theory of Damages

The Complaint asserts that "Mr. Little's loss, based on the decrease of Book Value of his shares, is $432,000." Compl. ¶17. This allegation is implausible for a host of reasons.

As a threshold matter, book value per share is not a measure of market price, but a self-calculated metric that approximates the dollar amount a shareholder could receive if a company is liquidated at the moment of calculation. Plaintiff has no power to demand the book value of shares be paid to him, and any purported "loss, based on … Book Value" is completely unrealized and unrealizable other than in liquidation. To state the obvious, as an investor in a publicly listed stock, Plaintiff *has no power to obtain the book value of his shares from anyone*. The only place where he can realize gain or loss is the stock market, where the market price provides the sole basis for gain or loss. Had Plaintiff tried to sell his shares for book value, he would have found no buyers.

Recognizing this reality, courts that have confronted the same theory of damages as alleged here have rejected it out of hand. *See e.g. Opdyke v. Sec. Sav. & Loan Co.*, 157 Ohio St. 121, 148, (1952) ("[Plaintiff's] arguments … are necessarily based either on the premise that book value represents actual value or … that the stockholders of defendant corporation had some reasonable means of realizing the book value of their shares. Neither of these premises is sound."); *Brady v. Anderson*, 1998 U.S. Dist. LEXIS 20774, at \*28-29 (C.D. Cal. May 27, 1998) ("book value and market value are different concepts, and the securities laws presume that investors know the difference."); *United States v. Hester*, 2015 U.S. Dist. LEXIS 173394, at \*9 (S.D. Cal. Dec. 30, 2015) (finding no damages on a book value basis where "fair market value [of a set of loans] would be substantially less than the book value.")

Indeed, as both NYSE and the SEC have recognized, "*book value is not a meaningful measure to be used in determining whether a transaction is dilutive or should otherwise require shareholder approval*." Securities Exchange Commission Release No. 34-85374 (March 20, 2019), at 6; *see also* Securities Exchange Act Release No. 84821 (Dec. 14, 2018), 83 FR 65378, at 65379. Accordingly, in early 2019, the SEC approved and NYSE implemented revisions to

NYSE's listing rules that eliminated per share book value as a factor when considering whether listed companies must obtain shareholder approval for certain share-issuance transactions. *Id.*

Because ***there can be*** no "loss" based on book value, Plaintiff's attempt to allege damages via this metric is misguided. *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009) (holding that plaintiff had failed to allege injury in fact where alleged damages relied upon speculative and conjectural assertion that "some iPods have the 'capability' of producing unsafe levels of sound and that consumers 'may' listen to their iPods at unsafe levels combined with an 'ability' to listen for long periods of time"); *see also Whitson v. Bumbo*, 2009 U.S. Dist. LEXIS 32282, at *23 (N.D. Cal. Apr. 15, 2009) (holding that plaintiffs had failed to allege injury in fact in case involving defective high-chair for use by infants where it was not alleged that plaintiff or her child suffered any injury as a result of defect); *In re Medvedeva*, 2009 U.S. Dist. LEXIS 95809, at *4 (W.D. Wash. Sep. 30, 2009) (finding no standing where the alleged harm is predicated on putative rights in the proceeds of a home sale that was "***still unrealized***.") (emphasis added).

Here, the alleged harm is even less cognizable than in *Birdsong*, *Whitson*, and *In re Medvedeva*, since book value, regardless of what it may mean for an investor's decision to invest, is ***unrealizable*** and can never ***be*** the basis of any damage to public shareholders.

It is axiomatic that "[w]hile the judicial system has been established to allow an aggrieved party a forum to recover for damages allegedly suffered by the actions of a defendant, it is not required to entertain actions where plaintiffs have not suffered any damages." *Peterson v. 21st Century Centennial Ins. Co.*, 2015 Del. Super. LEXIS 335, *7 (July 9, 2015). Here, setting aside the dispositive fact that book value per share cannot even be a meaningful measure of harm, there is not a single allegation in the Complaint even hinting at any actual, realized loss. Plaintiff does not—and cannot—allege that the Private Placements harmed the market value of his shares because that is utterly implausible, and the opposite is true. Nor does Plaintiff allege he sold his shares at a loss. Even if he did, no allegation in the Complaint ties any wrongful Company action to any decline in its stock price. *See Lujan*, 504 U.S., at 560 ("there must be a causal connection between the injury and the conduct complained of").

**B.      In Any Event, Plaintiff Failed To Properly Plead Derivative Claims**

Even if, *arguendo*, the Complaint articulated any cognizable theory of liability or damages, it should still be dismissed because Plaintiff did not plead derivative claims, and furthermore, lacks derivative standing. Here, the Complaint pleads only direct claims, but Plaintiff's claims based on allegations of equity dilution are claims that can only be asserted by the Company, not individual shareholders. As such, the claims must be pled derivatively on behalf of the Company. But even if it were construed as derivative, the Complaint fails to establish derivative standing under Nevada law and Federal Rule of Civil Procedure 23.1.

**1.      Plaintiff's Claims Are Derivative, Not Direct**

In evaluating whether claims must be brought derivatively, "[t]he court must 'independently examine the nature of the wrong alleged and any potential relief to make its own determination' regarding the nature of the claims." *See Compartment IT2, Ltd. P'ship v. Fir Tree, Inc.*, 2018 U.S. Dist. LEXIS 54066, at *10 (D. Nev. Mar. 30, 2018) (quoting *Halpert v. Zhang*, 2015 U.S. Dist. LEXIS 42560, at *2 (D. Del. Apr. 1, 2015)). "Whether a claim is direct or derivative in nature turns on the following questions: '(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually).'" *Compartment IT2, Ltd. P'shi.*, 2018 U.S. Dist. LEXIS 54066, at *10 (quoting *Ace Am. Ins. Co. v. Hallier*, 2015 U.S. Dist. LEXIS 37820, at *2 (D. Nev. Mar. 25, 2015)).  Here, the answer to both questions is the corporation.

The Complaint alleges wrongful equity dilution of the Company's common stock. Compl. ¶¶ 12-15, 31-34, 39. Equity dilution is regarded by courts in Nevada and Delaware as a derivative claim.[9] *See Parametric Sound Corp. v. Eighth Judicial Dist. Court of Nev.*, 401 P.3d 1100, 1109

---

[9] Nevada law applies as "[i]n diversity actions, the characterization of an action as derivative or direct is a question of state law." *Sax v. World Wide Press, Inc.,* 809 F.2d 610, 613 (9th Cir. 1987). The Company is incorporated in Nevada. *See* Compl. ¶¶ 1-2. Nevada courts generally look to Delaware for guidance on whether complaints satisfy pleading requirements for derivative actions. *See Shoen*, 122 Nev. at 641; *In re AMERCO Deriv. Litig.*, 127 Nev. 196, 218 (2011); *Parametric Sound Corp.*, 401 P.3d, at 1109 ("While we have not examined equity dilution, the Delaware courts have.")

(Nev. 2017) (holding that "[a] claim for wrongful equity dilution is premised on the notion that the corporation [] issu[ed] additional equity for insufficient consideration," and that "a pure equity dilution claim is viewed as a derivative claim.") (citing *Feldman v. Cutaia*, 956 A.2d 644, 655 (Del. Ch. 2007)).

The Nevada Supreme Court in *Parametric* reasoned that equity dilution cases are derivative because "any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction." *Parametric Sound Corp. v. Eighth Judicial Dist. Court of Nev.*, 401 P.3d 1100, 1109 (Nev. 2017) (quoting *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006)).

Since the crux of the Complaint's alleged harm is wrongful equity dilution, the alleged wrong would have harmed all shareholders (*i.e.* the Company) equally, and it is the Company that would receive the benefit of any recovery. Nothing in the Complaint suggests Plaintiff himself suffered any unique harm independent of any harm the Company allegedly suffered. *See Compartment IT2, Ltd. P'shi.*, 2018 U.S. Dist. LEXIS 54066, at *11 ("[A] claim of direct injury 'must be independent of any alleged injury to the corporation.'") (internal citation omitted). Plaintiff's claims, whether styled as corporate waste or minority shareholder oppression, must be pled derivatively. The failure to do so alone warrants dismissal.

### 2. The Complaint's Allegations Fail Under Rule 23.1

Even if the Complaint is construed as alleging derivative claims, it still should be dismissed because it fails to meet the requirements for derivative actions set out in Federal Rule of Civil Procedure 23.1. "Rule 23.1 applies to shareholder derivative suits and provides that a shareholder must either demand action from the corporation's directors before filing suit or plead with particularity the reasons why such demand would have been futile." *Compartment IT2, Ltd. P'shi.*, 2018 U.S. Dist. LEXIS 54066, at *9 (quoting *Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014)).

The law of the state of the Company's incorporation applies to determine whether the Complaint meets the demand requirements of Rule 23.1. *See Simmonds v. Credit Suisse Sec. (USA)*

*LLC*, 2011 U.S. App. LEXIS 974, at *17 (9th Cir. Jan. 18, 2011) (applying Delaware law to find that pre-suit demand letters were inadequate because they failed to identify the wrongdoing allegedly perpetrated as well as the legal action the shareholder wants the board to take on the corporation's behalf). Nevada courts generally look to Delaware for guidance on whether complaints satisfy pleading requirements for derivative actions. *See Weinfeld v. Minor*, 2016 U.S. Dist. LEXIS 30117, at *16-17 (D. Nev. Mar. 8, 2016); *Shoen*, 122 Nev. at 641; *In re AMERCO Deriv. Litig.*, 127 Nev, at 218. Thus, while Nevada courts have not specifically dealt with the adequacy of demand letters, they would look to Delaware precedent.

To be adequate, demands to corporations must "specifically state: (i) the identity of the alleged wrongdoers, (ii) the wrongdoing they allegedly perpetrated and the resultant injury to the corporation, and (iii) the legal action the shareholder wants the board to take on the corporation's behalf." *Simmonds*, 2011 U.S. App. LEXIS 974, at *17 (quoting *Yaw v. Talley*, Civ. A. No. 12882, 1994 Del. Ch. LEXIS 35, at *7 (Del. Ch. Mar. 2, 1994)). Additionally, "the party asserting that a demand was made…bear[s] the burden of proof…" *Id*. Here, Plaintiff failed to make an adequate demand on the Company's Board, and failed to plead why a demand would be futile.

The Complaint includes four exhibits containing messages that Plaintiff and Plaintiff's counsel sent to the Company's Board. *See* Compl. Exhibits 1-4.

First, on July 12, 2019, Plaintiff sent a letter to the Company, asking four questions regarding the Company's private placement of 6,000,000 common shares in May 2019. Compl. ¶ 22, Exhibit 1. Plaintiff asked: "Did the Company obtain an Opinion Statement from their legal staff before executing this private transaction?  Did the Company consult council [sic] in Nevada as to any possible violations of state law?  Did the Company confer with the New York Stock Exchange? Are there some facts I have missed that would justify such a damaging transaction?" Compl. Exhibit 1.  Plaintiff did not explain the basis of any wrongdoing, nor demand any action to correct such wrongdoing from the Company. *Id*.

Plaintiff subsequently sent an email to the Company simply attaching his original letter and writing: "Please reply before the end of this month."  Compl. ¶ 23, Exhibit 2.

On August 8, 2019, Plaintiff's counsel then wrote to the Company "demanding a response to [Plaintiff's] prior letters." Compl. ¶ 25, Exhibit 3.[10]

On August 19, 2019, Plaintiff's counsel "re-sent their August 8, 2019 correspondence to CGA's Management … again demanding a response." Compl. ¶ 26, Exhibit 4.[11]

In all of these messages, Plaintiff and Plaintiff's counsel only asked for information from the Company, and threatened to sue if the Company did not provide such information. Setting aside the fact that Plaintiff could have answered his own questions by reading the Company's SEC filings, as set forth in Section II.C, *supra*, Plaintiff's exhibits fail every single prong of the test for demand adequacy, as Plaintiff: (i) never stated "the identity of the alleged wrongdoers": (ii) failed to state the "wrongdoing they allegedly perpetrated and the resultant injury to the corporation" (*see* Section IV.A, *supra*); and (iii) did not state "the legal action the shareholder wants the board to take on the corporation's behalf." *Simmonds*, 2011 U.S. App. LEXIS 974, at *17.

Remarkably, Nevada law does not even grant Plaintiff the right to demand information from the Company, as it only allows shareholders with 15% or more of the shares of a company to inspect the Company's books and financial records upon written demand and an affidavit of the shareholder's ownership in the company. *See* Nev. Rev. Stat. Ann. § 78.257. Plaintiff, who alleged he owned only 180,000 shares (Compl. ¶4), did not meet and could not have met these requirements. The same statute also exempts listed companies that comply with SEC reporting requirements (which the Company did) from the obligation to provide information to shareholders. *See* Nev. Rev. Stat. Ann. § 78.257(6).

In sum, the Complaint only alleges that Plaintiff repeatedly sought information from the Company that he had no right to seek and which had been disclosed. This fails under Rule 23.1.

---

[10] Specifically, the letter from Plaintiff's counsel stated: "on behalf of [Plaintiff] we hereby demand that you provide detailed responses to all questions raised in the enclosed letter within 7 (seven) days of the date of this letter. We have been authorized to institute legal proceedings if CGA does not take corrective measures within the time specified above." Compl. Exhibit 3.

[11] The email stated: "we hereby reiterate our demand for a response to the inquiries raised in our letter of August 8, 2019 and our client, [Plaintiff's] earlier letter…" Compl. Exhibit 4.

1

## V.  CONCLUSION

2  For the foregoing reasons,  the Complaint should be dismissed with prejudice.[12]

3  Dated this 13th day of December, 2019.

4  **AFN Law PLLC**

5  By

6  Angus F. Ni (admitted *pro hac vice*)

7  506 2nd Ave, Suite 1400
Seattle, WA 98104
Telephone: 646-543-7294

8

9  **Wendot Law Group**

10  /s/ *Yao Wen*
Yao (Kelvin) Wen, Esq (NBN 14299)

11  E-mail: ywen@wendotlaw.com
411 E. Bonneville Ave. #150

12  Las Vegas, NV 89101
Telephone: 702-520-8888

13

14

15

16

17

18

19

20

21

22

23

---

24  [12] The Court "does not err in denying leave to amend where the amendment would be futile." *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir. 2009). An amendment is futile when "the allegation of other facts

25  consistent with the challenged pleading could not possibly cure the deficiency," *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010), or when the amendment "would merely enlarge on the legal

26  theory rejected" by the Court. *Kentmaster Manufacturing v. Jarvis Products Corp*., 146 F.3d 691, 696 (9th Cir. 1998). Here, the complained-of transactions benefited shareholders. Accordingly, Plaintiff cannot state

27  a claim under any set of facts related to the transactions, making amendment futile. *See Ashcraft v. White Pine Cty. Hosp*. 2012 U.S. Dist. LEXIS 38058, at *10 (D. Nev. Mar. 21, 2012)

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5(b), I certify that on December 13, 2019, I caused the document entitled **DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**, to be served as follows:

| Attorneys of Record | Parties Represented | Method of Service |
| --- | --- | --- |
| John S. Delikanakis, Esq.<br>Nevada Bar No. 5928<br>Michael Paretti, Esq.<br>Nevada Bar No. 13926<br>SNELL & WILMER L.L.P.<br>3883 Howard Hughes Parkway, Suite 1100 Las Vegas, Nevada 89169<br>jdelikanakis@swlaw.com<br>mparetti@swlaw.com<br><br>Adam J. Rader, Esq.<br>Lawrence A. Steckman, Esq.<br>OFFIT KURMAN, P.A.<br>10 East 40th Street<br>New York, New York 10016<br>arader@offitkurman.com<br>lsteckman@offitkurman.com | Glenn Little | ☐  Personal Service<br>☑  Email/E-File<br>☐  Fax Service<br>☐  Mail Service |

/s/ *Angus Ni*
Angus Ni

Certificate of Service
No. 2:19-cv-01756-JCM-NJK

AFN Law PLLC
506 2nd Avenue, Suite 1400
Seattle, WA 98104
Phone: (646) 543-7294